UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

RUN IT FIRST, LLC, an
Ohio limited liability company,

      Plaintiff,                                 Case No.

      v.

CVS PHARMACY, INC.,                         **JURY TRIAL DEMANDED**
CAREMARK PCS HEALTH, L.L.C.,
EXPRESS SCRIPTS HOLDING
COMPANY, and OPTUMRX,

      Defendants.

_____/

## COMPLAINT

    Plaintiff, Run It First, LLC, brings this Complaint against Defendants, CVS Pharmacy, Inc.

("CVS Pharmacy"), and pharmacy benefit managers Caremark PCS Health, L.L.C. ("Caremark"),

Express Scripts Holding Company ("Express Scripts"), and OptumRX (together, "PBM

Defendants"), and alleges as follows:

## INTRODUCTION

    1.    This is an action in antitrust for Defendants' conspiracy to restrain trade in violation

of Section 1 of the Sherman Antitrust Act.  Specifically, CVS Pharmacy and the PBM Defendants

shared and acted on a shared common objective to limit prescription drug price competition by

foreclosing Run It First's participation in the market.

    2.    The rising cost of prescription drugs is a significant and growing concern for

consumers and benefit providers such as insurance companies, large employer groups that self-

insure, labor unions, and even Medicare and Medicaid (collectively referred to as "Payors").  Until

now, the pricing of prescription drugs has largely been controlled by pharmacy benefit managers

("PBMs"), as they negotiate and set the prices that consumers and Payors will pay for prescription drugs.  PBM Defendants are the largest PBMs in the country, providing pharmacy benefit services to over 70% of consumers and Payors.   Historically, the PBM Defendants have overpriced prescription drugs to increase their profit margins at the expense of consumers and Payors.

3.      Plaintiff Run it First developed an innovative technology to compete with PBMs in the pricing of prescription drugs, and to provide lower prescription drug costs to consumers and Payors. Seeing the threat of competition posed by Run it First, the PBM Defendants and CVS Pharmacy illegally conspired to attempt to eliminate Run it First's participation in the prescription drug market. As a result, Run it First has been unable to provide services to its customers (consumers and Payors).  Run it First's injury coincides with the public detriment in that as a result of Defendants' conspiracy, consumers and Payors will continue to overpay millions of dollars per year for prescription drugs.

## BACKGROUND

4.      Not everyone pays the same price for prescription drugs.  The same drug, at the same pharmacy, at the same time, can be priced substantially differently.  This is because PBMs negotiate prescription drug prices with pharmacies and drug manufacturers in a multi-sided market.  Practically anyone that has a health care plan likely carries a card with the name of a PBM on it, and that PBM's respective Prescription Benefit Identification Number (the "BIN" number). Yet, few even know that PBMs exist, let alone the PBM's significant control over the prices ultimately paid for prescription medication.

5.      PBMs originated in the 1960s, with the idea that they would act as "middle-men" to streamline the claims process between pharmacies and drug companies.  As the pharmaceutical industry grew, PBMs presented themselves as vehicles to maintain lower drug prices.  By

2

aggregating the various Payor groups and their members, PBMs have the ability to form large patient networks and negotiate drug prices from both pharmacies and the drug manufacturers, which would have no choice but to contract with the PBM to access their network of patients. The idea was that the savings negotiated by the PBMs would flow through to the Payors and their members.

6.      However, over time, PBMs evolved from "middlemen" to significant controllers of the drug pricing system.  Due to a series of mergers and acquisitions, nearly all PBMs eventually merged into three major companies — PBM Defendants Caremark, Express Scripts, and OptumRX.

7.      Despite the savings promised by the PBM Defendants, between 1987 and 2014, the costs of prescription drugs exploded by 1,100 percent. Today, the costs only continue to grow. This is due to the significant information advantage that the PBM Defendants hold in the complex pharmaceutical supply chain.

8.      Moreover, the PBM Defendants allow their Payor clients little to no access to the contracts between the PBMs and pharmacies/providers, or between the PBMs and drug manufacturers.  Yet, these contracts provide terms regarding rebates and discounts in drug prices for the PBM Defendants to (supposedly) pass on to their Payor clients.  With limited oversight and transparency, the PBM Defendants employ pricing strategies and techniques to maximize their profits at the expense of the Payor and its members.

9.      This lack of transparency means that the PBM Defendants obtain multiple revenue streams from different parties in the pharmaceutical chain – with each party not knowing what the other is paying.  For example, while pharmacies know what they are paid for every claim and their

aggregate contract guarantees with the PBMs, pharmacies rarely know what the PBM is charging the Payor for the same prescription.

10.     This lack of transparency was the subject of a 2016 congressional hearing about the product EpiPen.  At the hearing, the CEO of Mylan (EpiPen's manufacturer), Heather Bresch, released a chart demonstrating that more than half of the list price for the EpiPen (*i.e.*, $334 out of the $608 charged for a two-pack), goes to other participants-insurers, wholesalers, retailers, or the PBM.  However, when Representative Buddy Carter (the only pharmacist in Congress at the time) asked Ms. Bresch how much the PBM received, she responded that she "did not know the breakdown."  Carter responded "nor do I and I'm the pharmacist. . . . That's the problem, nobody knows." (https://prospect.org/health/hidden-monopolies-raise-drug-prices/ last visited July 5, 2021).

11.     What we do know is that there are a variety of deceptive tactics that the PBM Defendants use to inflate their profits at the expense of both Payors and end consumers – the first being the PBMs' concealment of rebates.  A PBM Defendant can secure a rebate from a drug manufacturer as a condition of putting its product on the list of reimbursable drugs (the "formularies") for the PBM's network.  Yet, the PBM has no obligation to disclose that rebate to its Payor clients.  The PBM can even call the "rebate" by another name, so that the Payors do not know if they are truly getting the full discount.   Additionally, the PBM may or may not place certain drugs on its formulary depending on the rebates it can obtain, rather than by the drug's cost or effectiveness.  As the PBM keeps the rebate, the benefit providers and consumers are deceived into paying more than the drug should have cost.

12.     The PBM Defendants also use pricing strategies to intentionally profit from their Payor clients by "spread pricing" drugs.  "Spread pricing" is when a PBM charges a Payor more

for a drug than the PBM reimburses the pharmacy, while the PBM retains the difference.  Spread pricing provides the PBM Defendants with an undisclosed revenue stream generated directly from drug costs paid by their Payor client. The PBM Defendants are thus incentivized to obtain the most aggressive discounts from pharmacies while only passing on to their Payor clients what they determine to be appropriate.

13.     Additionally, the PBM Defendants often charge unsuspecting consumers a copayment amount that is higher than the full cost of the drug paid by the Payor.  As a result, a consumer may be charged a $5 copay for their prescription drugs one month, and charged $100 copay for the same prescription drugs the following month.

14.     These are just some examples of the different schemes by the PBM Defendants to profit from Payors and consumers.  Ultimately, due to the lack of transparency, unjustifiable fees, and massive market consolidations, the PBM Defendants have become some of the most profitable corporations that most people do not even know exist.  And, as a tragic result, this contributes significantly to Americans paying the highest health-care prices in the world.

15.     To reduce these deceptive practices, Plaintiff Run it First developed an innovative, technology-driven method to promote transparency and accountability for the pricing of prescription drugs.

16.     Run it First contracts with Payors (benefit providers, labor unions, and large employer groups) to conduct real-time analyses of drug prices when a prescription is submitted by a pharmacy to a PBM for processing under a Payor's prescription drug benefit.  Payors that use Run it First have immediate access to competitive drug prices that may be lower than the prices negotiated by that Payor's PBM.

17.     As a practical matter, Run it First uses <u>existing</u> coordination of benefits processing standards, as established and maintained by The National Council for Prescription Drug Programs (the "NCPDP"), for online/electronic prescription claim billing. In other words, the use of Run it First does not require new technology.

18.     When a pharmacy receives a prescription for a patient whose Payor contracts with Run it First, the pharmacy simply updates the patient's profile in their pharmacy system with the Run it First BIN number and processing information.  Adding the Run it First BIN number to the individual's patient profile ensures that Run it First is the *primary processor* of the prescription claim, while the Payor's PBM is the *secondary processor*.

19.     Once Run it First is established as the primary processor, the pharmacy then submits the prescription claim to be filled (the "claims process"), and the prescription claim is sent first from the pharmacy to Run it First.

20.     Run it First processes the submitted prescription claim and analyzes it for compliance with industry standards and certain variables, including but not limited to the supply of the drug, the dispensing fee, and whether there is any vaccine administration of the drug.

21.     Using these variables among others, Run it First calculates at the point of sale: (1) the price for that specific prescription claim, (2) at that specific pharmacy, (3) for the specified quantity and days' supply, and (4) on that particular date and time of processing.  The price reached by Run it First after applying these variables is hereinafter referred to as the "RIF Contracted Price."

22.     The RIF Contracted Price represents the maximum amount that a drug should cost the Payor at a particular point in time. Once the RIF Contracted Price is assigned to the claim, it is sent to the PBM so that the PBM can conduct its negotiations and provide its PBM price.  The

entire claims process, including the assignation of the RIF Contracted Price, takes less than 7 seconds, with a very high percentage of claims processing under 2 seconds.

23.    The price generated by the PBM may be higher or lower than the RIF Contracted Price. If the PBM price is higher than the RIF Contracted Price, then the Payor may be charged the RIF Contracted Price as the cost of the prescription claim, resulting in immediate savings at the point of sale.

24.    If, however, the PBM price is lower than the RIF Contracted Price, then the Payor gets the point-of-sale cost advantage of the lower PBM price versus the RIF Contracted Price.

25.    Run it First is paid a fee by the Payor for their services.  The rate charged to the Payor is the lesser of: (1) a flat per prescription fee, or (2) a percentage of the savings realized by the Payor for the prescription drug claims.

26.    At the beginning of 2021, Run it First had contracted with Payor groups and Run it First's BIN numbers were being processed by Defendant CVS Pharmacy without issue.

27.    However, once the PBM Defendants began to learn of Run it First's services, they conspired with CVS Pharmacy to block Run it First's ability to participate in the prescription drug market by, *inter alia*, refusing to contract with Payor groups that wanted to use Run it First, and/or by refusing to process Run it First's BIN numbers.  Ultimately, Defendants share a common objective — to limit the prescription drug price competition by eliminating Run it First's participation in the prescription drug market.

28.    As a result of Defendants' conspiracy, Run it First is not able to service any of its clients which use CVS Pharmacy or any of the PBM Defendants. Because CVS Pharmacy is the largest in the nation used by large percent of patients within any given Payor group, such prohibition essentially forecloses RIF's ability to contract with Payor groups.

29.     This conspiracy between CVS Pharmacy and the PBM Defendants has produced anticompetitive effects because, by blocking Run it First from competing in the prescription drug market, consumers and benefit providers will continue to suffer from artificially increased drug prices and reduced quality of service at the hands of the PBM Defendants and CVS Pharmacy.

30.     The purpose of this lawsuit is to enjoin the PBM Defendants and CVS Pharmacy from further violations of the nation's antitrust laws and to restore the competition that has been lost due to the PBM Defendants' and CVS Pharmacy's illegal acts, and to award Plaintiff Run it First for the damages it has incurred as a result of Defendants' conduct.

31.     If not enjoined, Defendants' ongoing conspiracy will continue to cause Payors and consumers to overpay millions of dollars for prescription drugs than they otherwise would have paid had Run it First been able to compete in the market.

## PARTIES

32.      Plaintiff Run it First is an Ohio limited liability company with its principal place of business in Ft. Lauderdale, FL. Run it First is committed to empowering organizations and individuals to be informed about the prescription drug billing process and the prices of medications by developing a revolutionary new tool that provides the RIF Contracted Price for prescription drugs in real-time and at the point of sale.

33.     Defendant CVS Pharmacy, the retail division of CVS Health, is America's leading retail pharmacy.  As of December 31, 2020, CVS Pharmacy operated approximately 9,900 retail locations and 1,100 MinuteClinic locations, as well as online retail pharmacy websites, LTC pharmacies, and onsite pharmacies. CVS Pharmacy's principal place of business is in Woonsocket, Rhode Island.

34.     Defendant Caremark is a PBM owned by CVS Health and operates under a division of CVS Health.  Caremark's principal place of business is in Woonsocket, Rhode Island.

35.     Defendant Express Scripts is a PBM, with its principal place of business in St. Louis, Missouri.

36.     Defendant OptumRX is a PBM, with its principal place of business in San Diego, California.

## JURISDICTION AND VENUE

37.     The Court has jurisdiction over this action under 28 U.S.C. § 1332 because the aggregate amount in controversy exceeds $75,000 and Plaintiff is a citizen of a state different from that of any Defendant.

38.     This Court also has jurisdiction over this action under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 in that Plaintiff brings claims for injunctive and monetary relief to remedy Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

39.     This Court has personal jurisdiction over each of the Defendants because Defendants conduct business in Florida, maintain and carry on continuous and systematic contacts with Florida and this judicial district, regularly transact business within Florida and this judicial district, and regularly avail themselves of the benefits of their presence in Florida and this judicial district.

40.     Venue is appropriate within this district under 28 U.S.C. § 1391(b) and (c).

41.     All conditions precedent to this action have occurred, been performed, or been waived.

## FACTUAL ALLEGATIONS

***Defendants' dominance in the prescription drug market.***

42.     CVS Pharmacy is the largest single retail prescription pharmacy in the United States.  In 2019, CVS Pharmacy was responsible for about 34.55 percent of all retail prescriptions filled across the country.

43.     In 2007, CVS Caremark Corporation, the parent company of Defendant CVS Pharmacy, acquired PBM Defendant Caremark, forming the first vertical combination of PBM and retail pharmacy under one company.

44.     Beginning in approximately 2017 through the current date, the PBM Defendants controlled (and still control) a combined 75 to 80 percent of all pharmacy benefit services in the prescription drug market, and all three have consistently been listed in the top 22 of the Fortune 500.  Further, the Compound Annual Growth Rate ("CAGR") of PBMs in the United States is expected to rise at least 7% during the period of 2019-2025.

***The PBM Defendants "service" practically every player in the pharmaceutical chain.***

45.     The main reason that the ins and outs of PBM services remains so elusive is that the industry is largely unregulated and is governed by contracts with strict non-disclosure provisions.  The PBM Defendants supposedly "work for the benefit of" nearly all the entities above and below the PBM Defendants in the pharmacy billing process.  For example, each PBM Defendant contracts with Defendant CVS Pharmacy, and they profit from the money paid for prescription drugs.  Likewise, each PBM Defendant has a contract with their respective Payors, whose goal is to save as much money as possible in the purchase of prescription drugs.

46.     Additionally, strict confidentiality and non-disclosure clauses in the contracts between the PBM Defendants and the pharmacies, as well as in the contracts between the PBM

Defendants and the Payors, means that the pharmacies and Payors cannot disclose or communicate with each other as to the terms of their respective contracts and how the PBM Defendants' roles may create conflicts of interest.

***The Prescription Claim Lifecycle.***

47.    When a customer visits CVS Pharmacy to purchase prescription drugs, the pharmacist or pharmacy technician enters the prescription information and information from the customer's insurance benefits card into CVS Pharmacy's computerized claims processing system. Once this information is entered, CVS Pharmacy submits the claim for adjudication through a switch vendor.

48.    The switch vendor ensures that the information being transmitted conforms to the National Council for Prescription Drug Programs ("NCPDP") standards.  Additionally, the switch vendor serves to coordinate and securely route pharmacy claims to the appropriate BIN number (PBM/processor) for adjudication, and return the response generated by the BIN number back to the submitting pharmacy.

49.    The PBMs electronically verify and process the submitted claim, conduct their negotiations to determine the ultimate "bill price", and then apply any applicable cost sharing (*i.e.* copays/coinsurance) assigned by the Payor.  The bill price, less any cost sharing, is what is billed by the PBM to the Payor for each prescription claim.

50.    In the same instant as the bill price determination, PBMs also conduct their negotiations to determine the ultimate "pay price".  The pay price is the contracted rate of reimbursement between the pharmacy and the PBM.  The pay price, less any cost sharing generated by the "bill price", is what is returned to the pharmacy as the amount due for each prescription claim.

51. It is often during the adjudication of the prescription claim within each PBM that the different "bill prices" and "pay prices" are determined, and the PBM Defendants profit from their lack of transparency and deceptive business practices in the following ways:

    a. *Spread Pricing*: "Spread Pricing" is the intentional practice of billing a Payor more for a prescription claim than what is reimbursed to the pharmacy.  This practice is facilitated by the influential "middle-man" position of the PBM and via restrictive components intentionally built in to PBM contracts (*i.e.*, the contracts between the PBM and Payor, and the contracts between the PBM and pharmacy).  The contract terms allow for concealment of such differences in price, resulting in a revenue stream for the PBM.  Higher bill prices generate more PBM profit.  An illustration of a PBM engaging in spread pricing is provided in Paragraph 52, *infra*.

    b. *Co-Pay Markups*:  Prescription benefit plans often encourage the use of lower cost generic alternatives.  However, sometimes the generic drug itself costs even lower than the copay amount paid by the consumer. The PBM can still charge the full co-pay amount to the consumer, even though the drug cost is less, and the PBM retains the difference as profit.

    c. *Specialty Drug Pairing*: Many patients suffer from conditions which require treatment with specialty drugs.  A "specialty drug" is a high-cost prescription medication that is prescribed to treat complex and often life-threatening or chronic conditions, such as HIV, cancer, multiple sclerosis, and rheumatoid arthritis.  Many individuals that take specialty drugs also take generic drugs which treat the side effects caused by the specialty drug.  For example, a patient taking a drug to treat cancer may develop nausea as a side-effect of the drug and is thus also prescribed

a generic drug to treat the nausea. The PBMs will significantly raise the price of the generic drug, for no reason other than because it is "grouped" with the specialty drug for purposes of pricing. Because that generic drug is part of a therapy involving a specialty medication, and is being filled at a specialty pharmacy, PBMs apply less of a discount on the generic than if it were filled at a retail pharmacy. This means exorbitant profits realized by the both the PBM and the specialty pharmacy filling the generic prescription (while the PBM's other "client," the Payor, pays exorbitant and unnecessary charges).

    i. More often than not, the PBM owns or is directly affiliated with the dispensing specialty pharmacy, and the PBM mandates the use of the/their specialty pharmacy. This means the consumer (and Payor) must have the complete therapy (specialty and generic medication) filled only at the specialty pharmacy for coverage under the Payor's prescription benefit.

    ii. An example of the price difference between a generic filled at a retail pharmacy versus a specialty pharmacy is the following: The generic drug Tamoxifen [Tamoxifen Citrate Tab 20 MG; NDC: 00378027493; Quantity Filled: 90; Day Supply 90: a drug used to treat and prevent certain types of breast cancer] was filled at a Defendant PBM owned Specialty Pharmacy for a total drug cost of $121.24. The same medication/NDC, quantity and day supply, filled at a major national retail pharmacy chain, on the same day, would have cost about $38.95. A difference of $82.29.

d. _Concealment of Rebates_: On the back end of the prescription claim lifecycle, the PBM Defendants also unfairly profit via their concealment of rebates. For instance,

13

a PBM can secure rebates from a drug manufacturer as a condition of putting the manufacturer's product on the list of reimbursable drugs (the "formularies") for its network.  Yet, the PBM does not disclose that rebate to the Payor, and can even call the "rebate" by another name.  Additionally, the PBM may or may not place certain drugs on its formulary depending on the rebates it can obtain, rather than by the drug's cost or effectiveness.  As the PBM keeps the rebate, the Payor and its members are deceived into paying more than what the drug should have cost.

52.    Below is a diagram illustrating the prescription claim lifecycle where a PBM is engaging in "spread pricing".  *A larger version of the diagram is attached hereto as* **Exhibit "A"**.



53.    As demonstrated by the above diagram, although the cost for the prescription drug may be only $25.00, the PBM may engage in "spread pricing" and charge the Payor $50.00.  The PBM ultimately retains the $25.00 difference as profit.  While $25.00 may not seem like much in

14

isolation, this profit is multiplied by the millions of prescription claims processed by the PBM Defendants each year.

### *How Run it First creates transparency for its clients in the pricing of prescription drugs.*

54.     In order to prevent these deceptive practices and facilitate the lowering of overall prescription claim costs, Payors (whom the PBMs also allegedly "work for the benefit of"), contract with Run it First so that Run it First can provide its real-time RIF Contracted Price analysis for each prescription filled by the Payor.

55.     However, for Run it First to be incorporated into the Payor's prescription benefit, the claim software used by the pharmacy must allow a user the ability to add/input or select/access the Run it First BIN number so that it can be added to the patient's profile.  This way, when the pharmacy enters the BIN numbers for processing a claim, Run it First's BIN number is placed first in the coordination of benefits ("COB") sequence with the patient's PBM BIN number moving to the second processor position.  This update to the patient's pharmacy profile allows for the claim to be sent to Run it First – first – and then immediately proceed to the Payor's respective PBM.

56.     While the claim is with Run it First, Run it First analyzes, in real-time, the market and certain variables, including but not limited to the specific pharmacy providing the service(s), the specific drug/product NDC-11 (National Drug Code - 11 digits) that is being filled, the total quantity being dispensed, the total day supply the prescription was written for, whether the drug is generic or brand name, the ingredient cost, dispensing fee, applicable tax, and whether there is a vaccine administration fee associated with the prescription claim.  Run it First then, based on the contracted rates, calculates its RIF Contracted Price (*i.e.* the maximum cost that the Payor *should* pay for that drug, on that date, taking all of the aforementioned variables into consideration).  This

process takes approximately less than 7 seconds, with most claims completing their adjudication in less than 2 seconds.

57.     After the claim is processed through Run it First, Run it First's response is sent back to the pharmacy, and the claim is instantly sent to the PBM that will negotiate its own price. While the PBM price can vary depending on the respective PBM's negotiations, with companies using Run it First, the final price paid by the Payor should be the lesser of the two prices provided by Run it First and the PBM. Additionally, the Payor can use the RIF Contracted Price to audit the PBM price and challenge the PBM's charges should they be higher than the price provided by RIF.

58.     Below is a diagram illustrating the difference in pricing for a claim processed with Run it First versus the same claim processed without Run it First. *A larger version of the diagram is attached as* **Exhibit "B"**.





59.     As illustrated above, the prescription claim processed *without* Run it First totals $93.78, while the same prescription claim processed *with* Run it First totals $39.95.  Thus, in this example, if a particular PBM returns a price higher than the RIF Contracted Price of $39.95, the Payor may use the RIF Contracted Price to contest the difference in price (the difference being $53.83) charged by the PBM.

60.     Notably, because Run it First only contracts with Payors of prescription drugs, there is no conflict of interest with the pharmacies as there are with PBMs.

61.     Additionally, and as noted above, the RIF Contracted Price can act as an audit flag used by companies to ensure the PBM is following the guidelines of honest pricing practices. For example, regarding copay mark-ups, once the RIF Contracted Price is provided to the Payor, the PBM will be challenged if it charges the full copay amount, as Run it First communicates to its Payor-client that the contracted drug cost is actually less than the copay charged to the member at the pharmacy.

17

62.     Run it First also achieves the goals of NCPDP's billing standard in that it: (1) supports the needs of a wide base of potential users, (2) maximizes the use of existing relevant standards, (3) is unambiguous, and (4) is easy to implement by carriers and vendors.  Notably, the use of Run it First requires no new technology, software, processes, staff, certification, training needed by pharmacies, PBMs, or providers for utilization.

63.     Run it First's technology is the first of its kind, and was developed by industry leaders, many of which previously worked with or for the PBM Defendants and witnessed their deceptive practices firsthand.

64.     Indeed, Run it First's technology *increases* the competition in the prescription drug market, as it lifts the veil of secrecy regarding prescription drug pricing.  As a result, Payors using Run it First are more informed in choosing their PBMs and negotiating with them, increasing competition.

65.     Ultimately, Run it First is like the "CARFAX" for the prescription drug market. When one wants to purchase a vehicle, Carfax may provide information about that vehicle which one may compare to the information being given by the seller.  Run it First operates in this same manner and was designed specifically to work with the PBM Defendants and their Payor clients. Run it First is akin to a Carfax report for every prescription claim, on every fill, and in real-time at the point of sale.

### *CVS Pharmacy and the PBM Defendants conspire to eliminate Run it First from the prescription drug market.*

66.     Run it First initially began working with a smaller PBM, which is not a defendant in this action (the "Non-Defendant PBM"), and the Non-Defendant PBM and Run it First were experiencing success servicing their clients.

18

67.     Run it First also had an existing contract with a client of one of the PBM Defendants, OptumRX.

68.     Notably, between September 16, 2020 and March 18, 2021, Defendant CVS Pharmacy was actively processing Run it First BIN numbers in conjunction with Defendant OptumRx's BIN numbers and with the Non-Defendant PBM without issue.

69.     However, in October/November 2020, Run it First was negotiating a new contract with a labor union (the "Labor Union") whose PBM is also Defendant OptumRx.  Even though PBM Defendant OptumRx already shared an existing client (also a labor union) with Run it First, Defendant OptumRx, without reason, chose to cease facilitating Run it First from its coordination of benefits process (*i.e.* it ceased allowing Run it First to act as the primary processor in the prescription claim lifecycle). As a result, Run it First was unable to complete its contract with the Labor Union and became unable to continue servicing the existing client (the other labor union) that had already contracted with Run it First and PBM Defendant OptumRx.

70.     Based on events that happened at the same time, or immediately following OptumRx's decision to no longer facilitate Run it First, it is clear that the PBM Defendants and CVS Pharmacy conspired to eliminate Run it First's participation in the prescription drug market, and thus restrain trade by continuing to charge artificially inflated prices and decreased level of services to their "clients".

71.     Towards the end of 2020 (the same time that OptumRx ceased facilitating Run it First and blocked Run it First's ability to contract with the Labor Union), Run it First was negotiating a contract with a retirement association (the "Retirement Association"), wherein the Retirement Association was seeking Run it First's services for its public employees (the "Participants"). The Retirement Association's PBM is Defendant Caremark.

72.     On January 6, 2021, as part of Run it First's negotiations with the Retirement Association, the Retirement Association requested that Defendant Caremark provide claims information about the Participants to Run it First.

73.     Caremark PBM and Run it First thus entered into a Confidentiality Agreement (the "Confidentiality Agreement"), so that the Participants' claim information could be shared between PBM Defendant Caremark and Run it First in order for both companies to provide their respective services to the Retirement Association.  *A true and correct (redacted) copy of the Confidentiality Agreement is attached hereto as* **Exhibit "C"**.

74.     The Confidentiality Agreement further provided that Defendant Caremark and Run it First were "Business Associates" of the Retirement Association and that each "has or will separately enter into a Business Associate Agreement" with the Retirement Association which sets forth their respective obligations.  *See* **Exhibit "C" at ¶ 2**.

75.     As is clear from the aforementioned facts, in early January 2021, PBM Defendant Caremark – which is owned by the same company that owns Defendant CVS Pharmacy – was able and willing to work with Run it First.

76.     Then, PBM Defendant Caremark requested a telephone conference between several Caremark executives and Run it First.  The telephone conference took place on March 2, 2021, at 4:30 p.m. Eastern (the "March 2 Conference").

77.     On that date, during the telephone conference, six (6) executives from PBM Defendant Caremark further inquired as to Run it First's business model and claims processing procedures.  Among those on the call on behalf of PBM Defendant Caremark were the head of the Employer Division, Senior Director of Pricing and Network Product Innovation, and the Executive Director of Sales & Account Management.

78.     Immediately following the March 2 Conference, upon information and belief, the PBM Defendants communicated with CVS Pharmacy and CVS Health regarding the competitive threat posed by Run it First to CVS Pharmacy, Caremark and the other PBM Defendants.

79.     This, in part, is evidenced by the fact that on that same date (March 2, 2021), CVS Health Senior Legal Counsel Stacey Bernstein, who was **not** a participant on the March 2 Conference call, and importantly, works for the parent company that owns Defendants CVS Pharmacy and PBM Caremark, began looking at the LinkedIn profiles of Run it First employees and generally investigating Run it First.

80.     This is further evidenced by the fact that, during this same time, Run it First was negotiating a contract with the Great Lakes Council of Governments, who uses PBM Defendant Express Scripts.  Within just **48 hours** of Run it First's call with PBM Defendant Caremark, Defendant Express Scripts also requested telephone conference with Run it First.  That conference took place on approximately March 4, 2021, at 10:00 a.m. (the "March 4 Conference"), with eleven (11) Express Scripts executives participating, including Express Scripts' Senior Director of Network Strategy, the Sr. Director of Supply Chain Strategy, the Director of Operations, the Vice President of Retail Contracting and Strategy, and the Director of Network Strategy, Operations.

81.     During the March 4 Conference, Run it First went over its entire process, utilizing a live webinar and white board session.  Run it First covered the life cycle of a claim from the perspective of the patient, the pharmacy, and the PBM.  PBM Defendant Express Scripts then inquired, and Run it First provided information, as to how a pharmacy can reconcile the reimbursement rate being received on a claim that uses Run it First back to the appropriate PBM contract.  Run it First also reviewed with PBM Defendant Express Scripts the NCPDP Basis for Reimbursement Determination (NCPDP Field: 522-FM) code(s) that is sent back on every NCPDP

billing transaction indicating what the cost basis used by the PBM for each claim is with an emphasis on the use of codes "14: Other Payor-Patient Responsibility Amount" and "15: Patient Pay Amount" for use in resolving any reimbursement and reconciliation questions.  Additional topics covered included how PBM Defendant Express Scripts would configure their adjudication platform to accommodate Run it First for mutual clients.

82.     At the same time, (specifically on March 3, 2021), Defendant CVS Pharmacy began policing Run it First to further Defendants' conspiracy.  At around 11:00 a.m. that morning, Run it First was contacted via email by the President of Script Care, Ltd. ("SCL"), Kevin Brown, requesting a call to catch up/touch base regarding CVS Pharmacy.  (SCL's retail network consists of over 70,000 participating pharmacy providers, including Defendant CVS Pharmacy.)  Run it First and Mr. Brown spoke on that same date at approximately 3:30 p.m. Eastern. On this call, Mr. Brown indicated that CVS Pharmacy's corporate office had contacted SCL and demanded that CVS pharmacies be removed/excluded from using Run it First.  SCL informed CVS that it would not remove Run it First, and that SCL would contact Run it First for more information.

83.     Mr. Brown then went on to say that the representatives from CVS Pharmacy were suspiciously asking him numerous questions about Run it First to which he did not provide immediate answers.

84.     SCL inquired Run it First as to why CVS Pharmacy's corporate office was contacting SCL about using Run it First.  SCL noted that this request from CVS Pharmacy was strange, as over a 6-month period, Run it First had only processed a total of twenty-five (25) claims at CVS pharmacies.  SCL, knowing that CVS pharmacies fill hundreds of millions of prescriptions a year, then asked Run it First how CVS could have possibly found these claims, and, why just 25

claims would warrant such outreach by CVS Pharmacy to SCL. The answer is that CVS Pharmacy was colluding with the PBM Defendants.

85. Mr. Brown further said that CVS — the largest pharmacy in the U.S. — claimed that Run it First presents an "operational issue" which it did not clearly define (despite CVS having already processed claims with Run it First).

86. CVS then told Mr. Brown that the CVS coordination of benefits ("COB") instructions posted on the Run it First website was an issue as such information was "proprietary," and demanded that Mr. Brown request Run it First to remove that information from the Run it First website immediately.

87. Mr. Brown was then informed by Run it First about the March 2 Conference with Caremark that had taken place the prior afternoon. SCL, through Mr. Brown, then asked refresher questions about Run it First's process and how Run it first facilitates the NCPDP standards. Mr. Brown then indicated that he would confer with his Provider Relations Department and CVS for additional clarification.

88. About a week later, on March 10, 2021, Mr. Brown reached out to Michael Mindala (Run it First) via email to request a call to review some questions that originated from SCL's conversations with CVS Corporate, in advance of a conference call SCL was scheduled to have with CVS. The discussion between Mr. Brown and Mr. Mindala centered around the three NCPDP COB calculation methods/options as well as pharmacy reimbursement identification and contract reconciliation.

89.     On March 11, 2021, Mr. Brown informed Run it First that CVS sent SCL a legal notice, and that SCL would be contacting Run it First to discuss further. The notice (according to SCL) threatened termination of the entire SCL – CVS contract unless CVS's COB instructions, which Run it First had on a pdf posted to its website, were removed.[1]

90.     A conference call was held on March 18, 2021, between Kevin Brown, Frank Messina (also from SCL), and Michael Mindala (Run it First).  Mr. Brown started the call with the phrase "CVS lied to us".  Mr. Brown indicated it was clear that CVS Pharmacy was refusing to continue participation with Run it First – not because of an operational issue, but rather, because CVS Pharmacy wanted to inhibit or hinder Run it First from competing in the pharmaceutical market as a savings tool specifically for Payors.

91.     CVS Pharmacy further told SCL that they would no longer participate in processing Run it First's BIN numbers because CVS Pharmacy "does not understand" how Run it First works. (Again, CVS Pharmacy had already been processing claims with Run it First BIN numbers for months.)  SCL offered to bring Run it First into the conversation so that CVS could ask Run it First any questions to facilitate their 'understanding', but CVS declined.  Further, CVS Pharmacy proceeded to tell SCL that since SCL refused to exclude CVS pharmacies from being able to be used by Run it First, CVS would be directly deactivating and removing the Run it First BINs from their retail pharmacy platform/system.

---

[1] CVS also indicated to SCL that Run it First's use of the CVS logo is unauthorized and needs to be taken down along with the COB instructions. However, Run it First never used the CVS logo.  The document had the letters C, V, and S in red (not CVS *red*) Alegreya Sans Black font, available for use in Adobe Acrobat Pro DC.

92.     Michael Mindala (Run it First) was contacted on Friday, March 19, 2021, by Frank Messina (SCL).  Mr. Messina informed Mr. Mindala that CVS had removed Run it First's BINs from their pharmacy system and that CVS Pharmacy was demanding that Run it First remove CVS Pharmacy's COB information and their 'logo' from the Run it First website by 5:00 PM CST that same day.

93.     The CVS-COB information and 'logo' remained on the Run it First website, and at 6:15 PM, Mr. Brown called Mr. Mindala on his cell phone.  Mr. Brown wanted to further discuss CVS's demands that Run it First remove the CVS information from its website.  Mr. Brown then told Run it First that if the information was not taken down by midnight, CVS Pharmacy would cancel its entire contract with SCL. In other words, every prescription claim associated with SCL, its clients, and covered patients would no longer be able to be filled at any CVS Pharmacy nationwide, and the patients would be forced to pay 100% out of pocket for the prescription or use another pharmacy that contracts with SCL.

94.     Mr. Brown was very concerned because CVS pharmacies are a major provider in SCL's national pharmacy network (named the SCL Clearview network).  He said that out of SCL's entire book of business, 80 million prescriptions are filled annually at CVS pharmacies under the SCL Clearview network contract, and to have CVS Pharmacy cancel the contract would inflict significant disruption and damage to SCL.

95.     Run it First removed the CVS-COB information and 'logo' from their website at 8:34 PM EST – well before midnight.

96.     On Monday, March 22, 2021, Run it First contacted SCL to inform them that Run it First BIN numbers were still in the CVS system, and that without more information and/or clarification on the situation, Run it First intended to repost the CVS-COB information and 'logo'.

Run it First informed SCL that all the CVS-COB information posted to the Run it First website was available to the public and found on the internet in numerous locations and was not – contrary to CVS's allegations – proprietary information.

97.     Examples of sources used by Run it First for the COB verbiage are BYDUREON BCise Savings Card (**Exhibit "D"**), and the Mayne Pharma copay assistance card (for products DoryxMPC, FABIOR, LEXETTE, and Sorilux; (**Exhibit "E"**). Additionally, one of Run it First's employees was previously a retail pharmacy technician at CVS Pharmacy and remains very familiar with their pharmacy software system and pharmacy operations.  That employee helped to validate the accuracy of the information found on the Mayne Pharma copay assistance card.

98.     SCL (through Frank Messina) told Mr. Mindala that they could not provide Run it First with documentation or correspondences associated with the CVS contract.  SCL further communicated to Mr. Mindala that according to CVS, CVS would be monitoring the Run it First website for "compliance", and that if the CVS-COB information was reposted, SCL would have to terminate its use of Run it First to avoid a 'contractual breach' that would jeopardize the contract between SCL and CVS Pharmacy.  Run it First, for the sole reason of not endangering SCL's business, agreed to not repost the contested CVS-COB information.

99.     Ultimately, towards the end of March, 2021, PBM Defendants Caremark and Express Scripts followed the lead of PBM Defendant OptumRx and refused to work with Run it First.

100.    And, on March 25, 2021, Defendant CVS Pharmacy proceeded to remove all Run it First BIN numbers from its systems.  As a result, if a claim was presented to CVS Pharmacy with Run it First's BIN number, CVS Pharmacy would refuse to process the claim through Run it

First. This made it impossible to utilize Run it First at any CVS pharmacy, nationwide, regardless of who the Payor's PBM was/is.

101.    Although PBM Defendant Caremark, like CVS Pharmacy, is under the CVS brand, PBM Defendant Caremark and CVS Pharmacy are required to operate independently as per the CVS and Caremark merger of 2007 that requires CVS Health to maintain stringent firewall protections between their CVS Pharmacy retail business and their CVS Caremark PBM business to prevent any anti-competitive activity and avoid conflicts of interest.

102.    However, the chain of events between the time that PBM Defendant OptumRx ceased processing its coordination of benefits with Run it First, followed by the back to back phone conferences requested by PBM Defendants Caremark and Express Scripts, and culminating in CVS Pharmacy eliminating Run it First's BIN numbers and policing the Run it First website — all within a three-month period — is evidence of communications between the PBM Defendants and CVS Pharmacy to conspire to eliminate Run it First from competing in the prescription drug market.

103.    In taking the above conspired actions, CVS Pharmacy and the PBM Defendants are using their market power to attempt to eliminate Run it First's presence in the prescription drug market so that CVS Pharmacy and the PBM Defendants continue to profit and grow off their deceptive practices.

104.    Additionally, these actions by CVS Pharmacy and the PBM Defendants are illegal restraints on trade, as Defendants' actions serve to continue the artificial inflation of prescription drug prices and decreased services for American consumers, benefit providers, and employer groups.

105.     As a result of Defendants' anticompetitive conduct, Run it First has incurred (and continues to incur) damages of at least $400,000 per month, or $4.8M annually.

## CAUSES OF ACTION

### COUNT I
**Conspiracy in Violation of Section 1 of the Sherman Act**
**(against all Defendants)**

106.     Plaintiff hereby reasserts the allegation set forth in Paragraphs 1 through 105 as if fully set forth herein.

107.     Beginning no later than November 2020, and continuing to date, Defendants and their co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This offense is likely to continue and recur unless the relief requested is granted.

108.     The conspiracy and agreement consist of an understanding and concert of action about Defendants and their co-conspirators to raise prescription drug prices and to limit price competition among the PBM Defendants, ultimately effectuated by collectively adopting and adhering to functionally identical deceptive practices in pricing prescription medications and products.

109.     The acts which some or all the Defendants committed for the purpose of forming and effectuating this agreement and conspiracy include, *inter alia*:

>        a.     Sharing their business information, plans and strategies in order to formulate ways to artificially maintain inflated retail prescription drug prices through price spreading and co-pay mark-ups;

28

b.      Eliminating the ability for anyone that uses CVS Pharmacy (the leading U.S. pharmacy) to also use Run it First's services, which they freely contracted for; and

c.      Eliminating the ability of employer groups, labor unions and other benefit providers to fund the decrease of retail prescription drug prices out of their own margins.

110.    Moreover, Defendants' conspiracy and agreement has resulted in obvious and demonstrable anticompetitive effects on consumers in the prescription drug market by depriving consumers of the benefits of competition to negotiate retail drug prices, such that it constitutes an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

111.    The relevant product market for the purpose of this action is the prescription drug market.  The anticompetitive acts at issue in this case directly affect the sale of prescription drugs to consumers.  No substitute exists for prescription drugs, and the Defendants have been able to impose and sustain a significant, artificial increased price for the sale of prescription drugs to consumers and benefit providers alike.

112.    The relevant geographic market is the United States.

113.    The PBM Defendants possess market power in the negotiation of prescription drug prices in the prescription drug market.  The PBM Defendants successfully imposed and sustained significant price increases for prescription drugs.

114.    Collectively, the PBM Defendants negotiate the prices for a wide variety of prescription drugs and provide critical services to over 70% of American consumers through their labor unions and benefit providers, among others.

115.    This matter is of great public importance, as the accessibility of prescription drugs can many times be a matter of life or death – or at least a matter of significant importance, particularly considering recent events and the COVID-19 pandemic.

116.    Defendants' agreement and conspiracy has had and will continue to have anticompetitive effects, including:

    a.    Artificially increasing the prices of prescription drugs;

    b.    Restraining competition on price among the PBM Defendants;

    c.    Constraining innovation in the prescription drug market;

    d.    Entrenching their favorable position in the negotiation and sale of prescription drugs;

    e.    Making more likely the express or tacit collusion among PBMs and pharmacies; and

    f.    Reducing competitive pressure on the negotiation of lower prescription drug prices.

117.    Defendants' agreement and conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

WHEREFORE, Plaintiff, Run it First, respectfully requests that the Court:

a.    Adjudge and decree that Defendants entered into an unlawful agreement, combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

b.    Enjoin the Defendants, their officers, agents, servants, employees and attorneys and their successors and all other persons acting or claiming to act in active concert of

participation with one of more of them, from continuing, maintaining or renewing in any manner, directly or indirectly, the conduct alleged herein or from engaging in any other conduct combination, conspiracy, agreement, understanding, plan, program, or other arrangement having the same effect as the alleged violation or that otherwise violates Section 1 of the Sherman Act, 15 U.S.C. §1, through fixing the manner in which they negotiate and/or sell prescription drugs, or otherwise collectively restraining price competition for prescription drugs;

c.      Order Defendant CVS Pharmacy to reinstate Plaintiff Run it First's BIN numbers;

d.      Award Plaintiff treble damages for the damages Plaintiff has suffered as a result of Defendants' illegal conduct;

e.      Award Plaintiff its attorneys' fees and costs in bringing this action; and such other and further relief as may be appropriate and as the Court may deem just and proper.

**COUNT II**
**Violations of the Florida Antitrust Act, Fla. Stat. §542 *et seq.***
**(against all Defendants)**

118.    Plaintiff hereby reasserts the allegations in Paragraphs 1 through 105 as if fully set forth herein.

119.    Beginning no later than November 2020, and continuing to date, Defendants and their co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of trade and commerce, constituting a violation of the Florida Antitrust Act, Fla. Stat. §542 *et seq.*  This offense is likely to continue and recur unless the relief requested is granted.

120.    The conspiracy and agreement consist of an understanding and concert of action about Defendants and their co-conspirators to raise prescription drug prices and to limit price competition among the PBM Defendants, ultimately effectuated by collectively adopting and

adhering to functionally identical deceptive practices in pricing prescription medications and products.

121.    The acts which some or all of the Defendants committed for the purpose of forming and effectuating this agreement and conspiracy include, *inter alia*:

      a.    Sharing their business information, plans and strategies in order to formulate ways to artificially maintain inflated retail prescription drug prices through price spreading and co-pay mark-ups;

      b.    Eliminating the ability for anyone that uses CVS Pharmacy (the leading U.S. pharmacy) to also use Run it First's services, which they freely contracted for; and

      c.    Eliminating the ability of employer groups, labor unions and other benefit providers to fund the decrease of retail prescription drug prices out of their own margins.

122.    Moreover, Defendants' conspiracy and agreement has resulted in obvious and demonstrable anticompetitive effects on consumers in the prescription drug market by depriving consumers of the benefits of competition to negotiate retail drug prices, such that it constitutes an unreasonable restraint on trade in violation of the Florida Antitrust Act, Fla. Stat. §542 *et seq.*

123.    The relevant product market for the purpose of this action is the prescription drug market.  The anticompetitive acts at issue in this case directly affect the sale of prescription drugs to consumers.  No substitute exists for prescription drugs, and the Defendants have been able to impose and sustain a significant, artificial increased price for the sale of prescription drugs to consumers and benefit providers alike.

124.    The relevant geographic market is the United States.

125.     The PBM Defendants possess market power in the negotiation of prescription drug prices in the prescription drug market.  The PBM Defendants successfully imposed and sustained significant price increases for prescription drugs.

126.     Collectively, the PBM Defendants negotiate the prices for a wide variety of prescription drugs and provide critical services to over 70% of American consumers through their labor unions and benefit providers, among others.

127.     This matter is of great public importance, as the accessibility of prescription drugs can many times be a matter of life or death – or at least a matter of significant importance, particularly in light of the recent events and the COVID-19 pandemic.

128.     Defendants' agreement and conspiracy has had and will continue to have anticompetitive effects, including:

      a.      Artificially increasing the prices of prescription drugs;

      b.      Restraining competition on price among the PBM Defendants;

      c.      Constraining innovation in the prescription drug market;

      d.      Entrenching their favorable position in the negotiation and sale of prescription drugs;

      e.      Making more likely the express or tacit collusion among PBMs and pharmacies; and

      f.      Reducing competitive pressure on the negotiation of lower prescription drug prices.

129.     Defendants' agreement and conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

WHEREFORE, Plaintiff, Run it First, respectfully requests that the Court:

a.   Adjudge and decree that Defendants entered into an unlawful agreement, combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of the Florida Antitrust Act, Fla. Stat. §542 *et seq.*

b.   Enjoin the Defendants, their officers, agents, servants, employees and attorneys and their successors and all other persons acting or claiming to act in active concert of participation with one of more of them, from continuing, maintaining or renewing in any manner, directly or indirectly, the conduct alleged herein or from engaging in any other conduct combination, conspiracy, agreement, understanding, plan, program, or other arrangement having the same effect as the alleged violation or that otherwise violates the Florida Antitrust Act, Fla. Stat. §542 *et seq.*, through fixing the manner in which they negotiate and/or sell prescription drugs, or otherwise collectively restraining price competition for prescription drugs;

c.   Order Defendant CVS Pharmacy to reinstate Plaintiff Run it First's BIN numbers;

d.   Award Plaintiff treble damages for the damages Plaintiff has suffered as a result of Defendants' illegal conduct; and

e.   Award Plaintiff its attorneys' fees and costs in bringing this action; and such other and further relief as may be appropriate and as the Court may deem just and proper.

DATED this July 21, 2021.

DAMIAN & VALORI LLP | CULMO TRIAL
ATTORNEYS, P.A.
*Counsel for Plaintiff*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile:  (305) 371-3965

By: */s/Melanie E. Damian*
      Melanie E. Damian
      Florida Bar No. 99392
      Email:  mdamian@dvllp.com
      Allison Leonard
      Florida Bar No. 87061
      aleonard@dvllp.com
      Christine M. Dimitriou
      Florida Bar No. 99381
      cdimitriou@dvllp.com

      ANGELO & BANTA, P.A.
      515 East Las Olas Blvd. Suite 850
      Ft. Lauderdale, FL 33301

By: */s/ Thomas P. Angelo*
      Thomas P. Angelo
      Florida Bar No. 749400
      tpa@angelolaw.com