United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Run it First, LLC, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 21-22604-Civ-Scola |
| CVS Pharmacy, Inc. and others, | ) |
| Defendants. | ) |

### Order Granting Motion to Dismiss

Through this antitrust action, Plaintiff Run it First, LLC, complains that Defendants CVS Pharmacy, Inc.; Caremark PCS Health, LLC; Express Scripts Holding Company; and OptumRx conspired to restrain trade by refusing to do business with Run it First. (Compl., ECF No. 1.) The Complaint alleges two counts, both against all four Defendants: conspiracy in violation of § 1 of the Sherman Act (count one); and violations of the Florida Antitrust Act (count two). In response, the Defendants have jointly moved to dismiss the complaint, arguing it suffers from multiple defects, failing to set forth factual allegations (1) suggesting an agreement among the Defendants not to do business with Run it First; (2) establishing a relevant antitrust market; or (3) showing harm to competition. (Defs.' Mot. to Dismiss, ECF No. 39.) Run it First opposes the motion, insisting its complaint sufficiently alleges a hub-and-spoke conspiracy among the Defendants to fix prices, as well as a relevant market and harm to competition. (Pl.'s Resp., ECF No. 54, 4.) The Defendants have timely replied. (Defs.' Reply, ECF No. 57.) After careful review, the Court agrees with the Defendants that the complaint's allegations fail to allege a conspiracy among the Defendants. This alone means Run it First has failed to state a claim and, therefore, the Court **grants** the Defendants' motion to dismiss. (**ECF No. 39**.)

### 1. Background[1]

The rising cost of prescription drugs is a significant and growing concern for consumers and benefit providers, such as insurance companies, large employer groups that self-insure, labor unions, and even Medicare and Medicaid (generally all referred to as "Payors"). (Compl. ¶ 2.) The pricing of

---

[1] This background is based on the allegations the Plaintiff presents in its complaint. For the purposes of evaluating the Defendants' motion, the Court accepts the Plaintiff's factual allegations as true and construes the allegations in the light most favorable to it per Federal Rule of Civil Procedure 12(b)(6).

these drugs is largely controlled by what are known in the industry as pharmacy benefit managers ("PBMs"). (*Id.*) These PBMs, like Defendants Caremark, Express Scripts, and OptumRx act, primarily, as intermediaries, on the one hand, between pharmacies and drug companies and, on the other, between pharmacies and Payors. (*Id.* ¶¶ 1–2, 4–5, 8–9.) In doing so, these PBMs exert tremendous control over how much Payors and insureds pay for prescription drugs, capitalizing on the PBMs' access to large patient networks and their abilities to negotiate not only drug prices with pharmacies and drug manufacturers, but also the reimbursement costs paid by the Payors and co-payments submitted by insureds. (*Id.* ¶¶ 2, 4–6.) The Defendant PBMs are able to further maximize their profits by preventing their Payor clients from accessing the pricing and service agreements the PBMs have with either the pharmacies or the drug manufacturers. (*Id.* ¶ 8–9.) And, while pharmacies are obviously aware of the amount they themselves are paid by the PBMs, they rarely know what the PBMs are, in turn, charging the Payors for that same prescription. (*Id.* ¶¶ 9–10, 51.) Similarly, the Payors have no way of determining how much of what they pay to the PBM actually goes to the pharmacy. (*Id.* ¶¶ 12, 51.) Furthermore, quite often, neither the pharmacies nor the Payors have any information about any incentives that the drug manufacturers might be conferring on the Defendant PBMs. (*Id.* ¶¶ 8, 11.) Between this lack of transparency, along with the Defendant PBMs large market share, the PBMs are able to manipulate prices at multiple transaction points in the chain of prescription-drug purchases and distributions, resulting in Payors and consumer/insureds' paying inflated prices. (*Id.* ¶¶ 11–14.)

In response to this set up, Run it First developed an innovative, technology-driven method designed to promote transparency and accountability for the pricing and servicing of prescription drugs. (*Id.* ¶ 15.) To do so, Run it First, for a fee paid by a Payor, inserts itself into the transactional chain, between a pharmacy and the PBM responsible for processing an insured's claim under a particular Payor's plan. (*Id.* ¶¶ 16, 25.) From that position, Run it First is able to conduct a real-time analysis of a drug price when a prescription is submitted by a pharmacy for processing by a PBM on behalf of a Payor, under that Payor's prescription-drug benefit plan. (*Id.*) According to Run it First, Payors that use Run it First's services have immediate access to competitive drug prices that may be lower than the prices negotiated by that Payor's PBM. (*Id.*) Under Run it First's system, Run it First becomes the "primary processor" of a prescription claim while the Payor's PBM becomes the "secondary processor." (*Id.* ¶¶ 18, 55.) Run it First, when it receives a claim, analyzes several variables and factors and, based on that analysis, determines the maximum amount that the drug *should* cost a Payor

or insured. (*Id.* ¶¶ 21–22, 56.) After Run it First processes the claim, sending its response to the pharmacy, the claim is also sent to the PBM, for it to evaluate and negotiate its own price. (*Id.* ¶¶ 22, 57.) According to Run it First's methodology, the Payor can then compare Run it First's price with the PBM's and select whichever one is lower. (*Id.* ¶¶ 23–24, 57.) The Payor can also use the Run it First price determination to audit the PBM's prices. (*Id.* ¶¶ 57, 61.) Ultimately, Run it First's service lifts the veil of secrecy regarding prescription drug pricing, leading to more informed Payors, ultimately lowering their drug costs. (*Id.* ¶ 64.)

   Between September 16, 2020, and March 18, 2021, CVS Pharmacy was processing claims, "without issue," through Run it First in conjunction with one of OptumRx's clients, a labor union-Payor, as well as with a smaller, non-party PBM. (*Id.* ¶¶ 26, 66–68.) During this time, in October and November 2020, Run it First began negotiating a contract with another labor union, also one of OptumRx's clients. (*Id.* ¶ 69.) However, at some point during the negotiation process, OptumRx reversed course and stopped allowing Run it First to participate in its coordination-of-benefits process, no longer permitting Run it First to act as the primary processor in the prescription-claim lifecycle for its clients' insureds' claims. (*Id.*) Thus, not only was Run it First unable to continue servicing the labor union it was already working with, with OptumRx's cooperation, but it was prevented from moving forward with the second labor-union client as well. (*Id.*)

   At about this same time, towards the end of 2020, Run it First was also attempting to negotiate a contract with one of Caremark's clients, a retirement association and its public employees. (*Id.* ¶ 71.) As part of these negotiations, in January 2021, the retirement association asked Caremark to provide claims information about the public employees to Run it First. (*Id.* ¶ 72.) Caremark and Run it First memorialized this information-sharing arrangement in a confidentiality agreement, describing themselves both as distinct "Business Associates" of the retirement association. (*Id.* ¶¶ 73–74.) The confidentiality agreement also set forth that both Run it First and Caremark would, separately, enter into agreements with the retirement association, outlining their respective obligations. (*Id.* ¶ 74.)

   A few months later, on March 2, 2021, several Caremark executives and Run it First representatives participated in a telephone conference, set up at Caremark's request. (*Id.* ¶ 76.) During the call, the Caremark executives asked about Run it First's business model and claims-processing procedures. (*Id.* ¶ 77.) On the same day as this conference call, senior legal counsel to CVS Health (both Caremark and CVS Pharmacy's parent company), began

investigating Run it First, accessing some its employees' LinkedIn profiles. (*Id.* ¶ 79.)

In the meantime, Run it First was also in negotiations with the Great Lakes Council of Governments, one of Express Scripts' clients. (*Id.* ¶ 80.) During a March 4 conference call between Run it First and Express Scripts, Run it First described its claims processing procedures, provided information about its reconciliations and reimbursement rates, and reviewed various National Council for Prescription Drug Programs standards and codes that Run it First uses for resolving reimbursement and reconciliation questions. (*Id.*)

Just the day before however, on March 3, non-party Script Care, Ltd., apparently one of Run it First's existing clients, had contacted Run it First, informing Run it First that CVS Pharmacy had told Script Care to stop using Run it First for claims involving CVS Pharmacy. (*Id.* ¶ 82.) Script Care, through its president, Kevin Brown, also told Run it First that CVS Pharmacy was asking him a lot questions about Run it First. (*Id.* ¶ 83.) Brown told Run it First that he was surprised that CVS Pharmacy was at all interested in Run it First, considering that, over a six-month period, Run it First had processed a total of only twenty-five claims at CVS Pharmacy stores—a minuscule number compared to the hundreds of millions of prescriptions CVS Pharmacy fills each year. (*Id.* ¶ 84.) Brown also told Run it First that CVS Pharmacy complained to him that Run it First presents an "operational issue" to CVS Pharmacy. (*Id.* ¶ 85.) Lastly, CVS Pharmacy also complained to Script Care about certain proprietary coordination-of-benefit instructions, purportedly belonging to CVS Pharmacy, on Run it First's website. (*Id.* ¶ 86.) CVS Pharmacy insisted that Brown tell Run it First to remove that information from its website immediately. (*Id.*)

About a week later, on March 11, Brown told Run it First that "CVS" escalated its complaint, sending Script Care a notice threatening to terminate CVS's contract with Script Care unless Run it First removed CVS's proprietary information and logo from Run it First's website. (*Id.* ¶ 89.) During a conference call, a week after that, on March 18, Brown told Run it First representative Michael Mindala that he believed CVS Pharmacy had lied about having "operational issues" with Run it First; instead, Brown said he believed CVS Pharmacy's goal was to prevent Run it First from competing in the pharmaceutical market. (*Id.* ¶ 90.) CVS Pharmacy also told Script Care that CVS would be deactivating and removing Run it First from its retail pharmacy platforms and systems. (*Id.* ¶ 91.)

The following day, on March 19, Script Care contacted Mindala to tell him that CVS had removed Run it First from CVS Pharmacy stores' systems and, further, CVS Pharmacy was demanding, once again, that Run it First

remove CVS's proprietary information and logo from the Run it First website by 5:00 pm that same day. (*Id.* ¶ 92.) After that deadline had passed, at 6:15 pm, Brown called Mindala on his cell phone and told him that if Run it First did not take down the information by midnight, CVS Pharmacy was going to cancel its entire contract with Script Care, forcing all Script Care insureds to either pay out of pocket for their prescriptions or to use another pharmacy that Script Care contracts with. (*Id.* ¶ 93.) As Brown explained it, either way, this would result in a significant disruption to Script Care's business. (*Id.* ¶ 94.) Run it First ultimately complied, removing the information and logo a few hours later. (*Id.* ¶ 95.)

Script Care later told Run it First that CVS would be monitoring the Run it First website for continued compliance and that if the information or logo were reposted, Script Care would be forced to terminate its relationship with Run it First altogether to avoid jeopardizing Script Care's contract with CVS Pharmacy. (*Id.* ¶ 98.) Not wanting to endanger Script Care's business, Run it First complied. (*Id.*) Finally, on March 25, 2021, CVS Pharmacy removed Run it First from all its systems, once and for all, refusing to process any claims involving Run it First, thereby preventing any PBM in the country from using Run it First's methodology to process a drug prescription through any CVS Pharmacy store. (*Id.* ¶ 100.)

By the end of March—Run it First doesn't say exactly when—Caremark and Express Scripts, like OptumRx, also decided, ultimately, not to work with Run it First. (*Id.* ¶ 99.)

## 2. Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A pleading must only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atlantic Corp*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support

the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

With respect to antitrust claims in particular, § 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The elements of a § 1 claim are: (1) a conspiracy that (2) unreasonably (3) restrains interstate or foreign trade. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019). Three general types of conspiracies are recognized: horizontal—involving agreements between companies that are direct competitors; vertical—involving agreements between businesses that operate at a different level of the same product or service's chain; and a hybrid form—referred to as a "hub and spoke" conspiracy "where an entity at one level of the market structure (the 'hub') coordinates an agreement among competitors at a different level (the 'spokes')." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1255–56 (S.D. Fla. 2021) (McAliley, Mag. J.). Importantly, "[u]nder *Twombly*, parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (citing (*Twombly*, 550 U.S. at 553–54). However, "mere allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a claim under § 1"; instead, "[p]laintiffs must plead something more, some further factual enhancement, a further circumstance pointing toward a meeting of the minds of the alleged conspirators." *Musical Instruments*, 798 F.3d at 1193 (cleaned up).

### 3. Discussion

The Defendants argue that Run it First has failed to allege facts supporting its claim that the Defendants violated either § 1 of the Sherman Act or its state analog, the Florida Antitrust Act.[2] In particular, the Defendants

---

[2] Courts look to the federal antitrust laws when evaluating claims brought under the Florida Antitrust Act. *See All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d

point to a dearth of facts that (1) could support a plausible inference that there was any anticompetitive agreement among the Defendants; (2) define the contours of a relevant antitrust market; or (3) show any harm to market-wide competition. (Defs.' Mot. at 2.) With respect to their first point, the Defendants expound that Run it First's allegations "show nothing more than each of the Defendants deciding independently—and at different times—not to assist [Run it First] in its efforts to disparage the Defendants and decrease their profits, as one would expect they would." (*Id.*) In response, Run it First submits it has adequately alleged a hub-and-spoke conspiracy to fix prescription drug prices. (Pl.'s Resp. at 5–13.) After careful review, the Court agrees with the Defendants: Run it First has failed to allege facts that plausibly support an agreement among the Defendants not to do business with Run it First. Because the Court finds Run it First's complaint lacks this crucial element, and is due to be dismissed on this basis alone, it declines to address the Defendants' other arguments, with respect to the relevant market or harm to market-wide competition.

"A hub-and-spoke conspiracy," which Run it First argues it has alleged, "is simply a collection of vertical and horizontal agreements." *Musical Instruments*, 798 F.3d at 1192. "A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *Musical Instruments*, 798 F.3d at 1192. The United States Supreme Court defines an agreement, for Sherman Act § 1 purposes, and as referenced in the third element, as "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

To establish such an agreement—a threshold issue in a Section 1 claim—an allegation of mere parallel conduct, even consciously parallel conduct, will not alone suffice. *Twombly*, 550 U.S. at 552. Indeed, a plaintiff "must 'plead something more,' 'some further factual enhancement,' a 'further circumstance pointing toward a meeting of the minds' of the alleged conspirators." *Musical Instruments*, 798 F.3d at 1193 (quoting *Twombly*, 550 U.S. at 557). These "plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Musical Instruments*, 798 F.3d at 1194. Parallel conduct, on the other hand,

---

740, 745 n.11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law.").

has been defined, simply, as similar action. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'"); *Quality Auto Painting*, 917 F.3d at 1263 (noting defendants' adoption of a "uniform" price suggests parallel conduct); *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1304 (11th Cir. 2003) (finding "repeated, synchronous pricing decisions" over seven years established parallel behavior).

As Run it First describes its case, CVS Pharmacy is the "hub," having coordinated an agreement with a group of competitors (the PBM Defendants) at a different level—the alleged "spokes." (Pl.'s Resp. at 6.) In response to the Defendants' motion to dismiss, Run it First maintains it has sufficiently alleged both parallel conduct as well as adequate plus factors plausibly suggesting this hub-and-spoke conspiracy among the Defendants. (Pl.'s Resp. at 7.) The Court disagrees. Regardless of whether the complaint succeeds in alleging facts supporting an inference of parallel conduct—of which the Court is not entirely convinced—it falls well short of alleging any plus factors from which the Court could plausibly infer an actual conspiracy among the Defendants—whether of the vertical, horizontal, *or* hub-and-spoke variety.

In support of its argument, Run it First lists what it describes as a "series of concerted events" which all took place "within a four-month period." (Pl.'s Resp. at 7.) Upon scrutiny, however, the Court finds these events to be separated in both time and context such that they do not amount to anything other than non-contemporaneous, independent action. The events and actions Run it First points to are summarized as follows:

- Although OptumRx stopped working with Run it First entirely in "October/November 2020" (Compl. ¶ 69 (emphasis added)), CVS Pharmacy continued to actively process claims (in association with an unnamed, non-defendant PBM) with Run it First's system through March 18, 2021 (*id.* ¶ 68);

- Caremark requested and participated in a conference call with Run it First on March 2, 2020, which involved Caremark executives' asking detailed questions about Run it First's systems and operations (*id.* ¶ 76–77);[3]

- On the same day as the Caremark conference call—March 2— inhouse counsel from CVS Health, a non-party and Caremark's

---

[3] By way of further background, in its complaint, Run it First explains that one of Caremark's Payor clients, a retirement association, began negotiating a contract with Run it First "[t]owards the end of 2020." (*Id.* ¶ 71.) To facilitate these talks, in early January, Caremark and Run it First entered into an agreement to facilitate the sharing of confidential information related to claims and participants associated with this Payor. (*Id.* ¶ 73.)

parent, accessed the LinkedIn profiles of various Run it First employees (*id.* ¶ 79);

- The next day, on <u>March 3</u>, CVS Pharmacy "began threatening the president of [non-defendant] PBM ScriptCare, Ltd., to remove Run it First from its network," falsely claiming that Run it First presented "operational issues" to CVS (Pl.'s Resp. at 8 (quoting Compl. ¶¶ 82–85));

- Two days after the call between Caremark and Run it First, on <u>March 4</u>, Express Scripts—whose Payor client, the Great Lakes Council of Governments, had been negotiating a deal with Run it First—also participated in a conference call with Run it First (Compl. ¶ 80);

- By <u>March 11</u>, CVS Pharmacy had sent ScriptCare a notice, threatening to terminate its contract with ScriptCare unless Run it First removed what CVS said was proprietary information from Run it First's website (*id.* ¶¶ 89–91, 93–94);

- After Run it First removed the information from its website, ScriptCare informed that CVS Pharmacy would be policing the website to ensure compliance (*id.* ¶ 98);

- Caremark and Express Scripts refused to work with Run it First "<u>towards the end of March 2021</u>" (*id.* ¶ 99 (emphasis added));

- CVS Pharmacy removed Run it First's systems from its stores on <u>March 25, 2021</u> (*id.* ¶ 100).

These events, either in isolation or together, do not plausibly support the inference of an antitrust agreement. Although all the Defendants ultimately made the same decision—not to work with Run it First—there is nothing in the complaint that shows they did so in coordination or by agreement. *See United Am.*, 530 F. Supp. 3d at 1259 (noting that even though all the defendants supported a particular course of action, relating to a certain Bitcoin protocol, without more, the allegations were insufficient to imply even parallel conduct, never mind any plus factors).

Indeed, these series of events imparts no information from which the Court could conceivably, never mind plausibly, discern concerted, cooperative action among the Defendants. First, OptumRx terminated its relationship, apparently "without reason," with Run it First, at the latest, in November 2020. (Compl. ¶ 69.) Over a month later, in January 2021, Caremark, in contrast, affirmatively expressed its ability and willingness to work with Run it First, in conjunction with one of Caremark's Payor clients, even participating in a conference call with Run it First in the beginning of March. (*Id.* ¶¶ 72–73, 75–77.) It was not until the end of March—some four months after OptumRx's

disengagement—that Run it First says Caremark decided not to continue working with Run it First. (*Id.* ¶ 99.) In still further contrast, the only meaningful contact Express Scripts appears to have had with Run it First, according to the complaint, is a March 4, 2021, conference call during which "Run it First went over its entire process," explaining, in response to Express Scripts' questions, how Express Scripts' claims could be reconciled after being processed through Run it First's system. (*Id.* ¶ 81.) Unlike OptumRx and Caremark, Express Scripts, according to the complaint, never actually worked with Run it First at all. Without providing any other information specific to Express Scripts' interactions with Run it First, the complaint just chronicles that, like Caremark, Express Scripts, some time "towards the end of March," also "refused to work with Run it First." (*Id.* ¶ 99.) These events show nothing more than three horizontally positioned entities who all unilaterally decided on a particular course of action in various, unrelated contexts and without any apparent connection except for their mutual, vertical relationship with a fourth entity—CVS Pharmacy, the purported hub in Run it First's alleged conspiracy.

As for the hub, because the complaint alleges not a single fact implicating an agreement between CVS Pharmacy and either OptumRx or Express Scripts, the only conceivable vertical conspiracy would have to be between CVS Pharmacy and its corporate sibling, Caremark. And, indeed, the most specific allegations in the complaint regarding any entity agreements are between Caremark and CVS Pharmacy and between Caremark and its parent, CVS Health. But even if those allegations were enough to allege some sort of "conspiracy" between those entities, neither corporate siblings nor a corporate parent and its wholly owned subsidiary are capable of conspiring with each other for purposes of § 1 of the Sherman Act. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 194 (2010) (parent and its subsidiary cannot legally conspire for the purposes of § 1 of the Sherman Act); *see Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1233 (10th Cir. 2017) (wholly owned subsidiaries of the same parent cannot conspire under § 1 of the Sherman Act) (collecting cases from the First, Third, Fourth, Fifth, Sixth, Eighth, and Ninth Circuits).

In addition to the specific actions set forth above, Run it First also points to other circumstances and conduct that it says suggest coordination among the Defendants. According to Run it First, these plus factors are: the purportedly "significant competitive advantage" one PBM Defendant would gain if it was the only PBM to implement Run it First (Pl.'s Resp. at 13); "past conspiratorial conduct by the PBM Defendants through their use of similar deceptive pricing strategies" (*id.* at 12); "the secrecy of the traditional PBM drug pricing system" (*id.* at 10); "the same drug, at the same pharmacy, at the same

time, can be priced substantially different[ly]" (*id*. at 10 (cleaned up)); "the Defendants dominate the prescription drug market" (*id*. at 12); and the speculative nature of how the use of Run it First might affect the PBM Defendants' profits (*id*. at 11). Contrary to Run it First's urgings, none of these purported plus factors makes the grade.

Indeed, many of them are not even supported by the complaint's factual allegations or are supported only by conclusory allegations. For example, Run it First fails to direct the Court's attention to any actual support in the complaint for its contention that if only one PBM Defendant agreed to work with Run it First, that that PMB would eventually gain advantages over the others. Moreover, the complaint's allegations actually refute Run it First's claim: OptumRx unilaterally refused to work with Run it First some four months before any of the other PBM Defendants appear to even have had occasion to interact with Run it First at all. (*See* Compl. ¶ 69.) Similarly, Run it First's conclusory supposition that the PBM Defendants have engaged in past conspiratorial conduct finds no support from the complaint's allegations. Nor, in any event, would such a generalized fact provide a basis upon which to infer the specific conspiracy Run it First alleges here. *See Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 543 (1954) (finding that a past conspiracy among defendants did not establish a separate conspiracy between those same defendants where the past conspiracy involved different business practices and a different plaintiff, during a different time frame).

Many of Run it First's other purported plus factors appear to simply be complaints about the way the Defendants operate, divorced from any explanation as to how these allegedly questionable business practices might imply something more than parallel conduct. For example, as set forth above, Run it First complains that the Defendants rely on secrecy in drug pricing and do not conventionally or consistently price prescription drugs. But Run it First makes no effort to explain why these practices, as dubious as they may be, suggest that the Defendants conspired in their refusal to work with Run it First.

Nor does Run it First's apparent criticism of the Defendants' combined market share amount to a viable plus factor. Simply because the Defendants, together, "dominate the prescription drug market," does not allow the Court to infer a conspiracy. Certainly, any plaintiff could lump together any group of competitors and then complain that they have an unduly large market share. But Run it First provides no support, nor is the Court aware of any, for the proposition that such a combination, in and of itself, can amount to a showing of a conspiracy.

Finally, Run it First—in the face of the Defendants' pointing out that the complaint fails to allege that the Defendants acted against their own self-interest—maintains that the Defendants' use of Run it First would not *necessarily* result in any lost profits. (Pl.'s Resp. at 11.) Run it First misses the point. To begin with, even if this were true, the possibility that the Defendants' business would not be harmed by agreeing to work with Run it First is irrelevant. That is, Run it First fails to connect the supposedly speculative nature of Run it First's impact on the Defendants' businesses with an affirmative showing that the Defendants were acting against their own self-interest. Furthermore, Run it First's hypothesis, that its business model would not "automatically" reduce the Defendants' profits seems, in any event, to be directly at odds with Run it First's own allegations that it "developed an innovative technology to compete with PBMs" in order to "provide lower prescription drug costs to consumers and Payors." (Compl. ¶ 3.) As demonstrated by Run it First's own examples, the whole point of Run it First's methodology appears to be to directly reduce the amount that PBMs are able to charge their Payor clients for prescription drugs. (*Id.* ¶¶ 59, 61.) The inescapable conclusion, then, would be that incorporating Run it First would inevitably lead to a reduction in a PBM's profits.

In sum, Run it First's arguments and allegations, while painting a disturbing picture of the state of the pharmacy-benefit-manager business, nonetheless fall short in the antitrust context. Ultimately, the Court finds the complaint's allegations fail to imply that the Defendants' "resistance to the upstart[]"—Run it First—"was anything more than the natural, unilateral reaction of each [Defendants'] intent on keeping its . . . dominance." *Twombly*, 550 U.S. at 566. In other words, even if the Defendants' refusals to work with Run it First were parallel, there is no plausible implication of conspiracy where each Defendant simply did "what was only natural anyway." *Id.*

### 4. Conclusion

For the foregoing reasons, the Court **grants** the Defendants' motion (**ECF No. 39**), thus **dismissing** Run it First's complaint **with prejudice** because it has failed to state a claim under Rule 12(b)(6). Further, the Court **denies** Run it First's request for **leave to amend**, inserted as an afterthought, in the last sentence of its twenty-page opposition to the Defendants' motion to dismiss: the request is both procedurally defective and lacking in substantive support. *See Newton v. Duke Energy Florida, LLC,* 895 F.3d 1270, 1277 (11th Cir. 2018) ("[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."); *Avena v. Imperial Salon & Spa, Inc.*, 740 Fed. App'x 679, 683 (11th

Cir. 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.") (noting also that "a motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment") (cleaned up).

The Clerk is directed to **close** this case. Any other pending motions are **denied as moot**.

**Done and ordered** in Miami, Florida, on February 15, 2022.

Robert N. Scola, Jr.
United States District Judge